

FILED
2011 Mar-31  PM 07:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LONG-LEWIS STERLING WESTERN STAR OF BESSEMER and LONG-LEWIS STERLING WESTERN STAR OF HUNTSVILLE,** | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action Number **2:09-cv-233-AKK** |
| **vs.** | ) ) ) | |
| **STERLING TRUCK CORPORATION and DAIMLER TRUCKS NORTH AMERICA, LLC,** | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the court is Defendants Sterling Truck Corporation's ("Sterling") and Daimler Trucks North America's ("DTNA") (collectively "Defendants") Motion for Summary Judgment, supporting briefs, and evidentiary submissions. Docs. 162, 163, 164, 166, 183, 185. Plaintiffs Long-Lewis Sterling Western Star of Bessemer and Long-Lewis Sterling Western Star of Huntsville (collectively "Plaintiffs") have responded, docs. 89, 136, 168, 189, and Defendants have replied, docs. 169, 190. Accordingly, this matter is ripe for resolution. For the reasons stated below, the motion is GRANTED.

1

## I.  APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.* at 324 (internal citations and quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence in the light most favorable to the nonmoving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally

insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

## II.  BACKGROUND

Based on the jointly submitted undisputed facts, doc. 172, and supplemental footnotes indicating information contained in Plaintiffs' expert Terry Humphyres' September 10, 2010, revised report, doc. 183-1, the facts are as follows:

1.   Freightliner Corporation purchased Ford Motor Company's heavy truck business in 1997 and renamed the line "Sterling." (Patterson Decl. ¶2)

2.   Freightliner Corporation became Freightliner LLC and then changed its name to Daimler Trucks North America LLC ("DTNA") in 2008.  DTNA is a subsidiary of Daimler North America Corporation, which, in turn, is a subsidiary of Daimler AG, the German manufacturer of passenger cars and trucks.  (*Id.* ¶1)

3.   Sterling manufactured various classes of heavy duty commercial trucks and sold them through a network of independent dealers.  (Second Amended Complaint "AC" ¶'s 5, 7; Patterson Decl. ¶2)

4.   Long-Lewis was a Ford medium duty truck dealer and became a Sterling dealer when Freightliner purchased Sterling.  (Burrell 9/11-11/22)

5.   Long-Lewis operates a Ford car and truck dealership in Hoover, Alabama, a wholesale hardware business in Birmingham, Alabama, and two Sterling dealerships, one in Bessemer and the other in Huntsville, Alabama.  (AC ¶'s 2, 11; Burrell 9/11-11/22, 14/7-15/4)

6.   At the Bessemer dealership, Long-Lewis also operates a Western Star franchise (another DTNA brand) and was authorized by DTNA to service Detroit Diesel engines.  (Osborne Decl. ¶1, 3, 6, 8; Burrell 70/5-80/2, 118/6-13)

7.   The Sterling Sales and Service Agreement ("SSA") between Sterling and
     Long-Lewis contains the following provision:

> IX.B.  Sterling Trucks PRODUCTS
> The Sterling Trucks PRODUCTS which DEALER is
> granted the right to purchase from COMPANY under this
> Agreement are Sterling Trucks Vehicles and Parts as
> listed in the Sterling Trucks Product Addendum.  The
> COMPANY reserves the right to discontinue at any time
> the manufacture or sale of any or all Sterling Trucks
> Products without prior notice or to change the design or
> specification for Sterling Trucks Products without prior
> notice to DEALER.

(Osborne Decl. ¶2, Exh. A-4, A-20; Burrell 19/17-24)

8.   Section XV.E. of the SSA is titled Continuance of Business Relations and
     provides in pertinent part:

> The continuance of business relations between
> COMPANY and DEALER following the termination,
> expiration, or nonrenewal of this Agreement shall not be
> construed as a waiver of the termination, or as a renewal
> or extension of this Agreement.

9.   Thereafter, Section XVIII.I. of the SSA is titled Compliance with Local Law
     and provides:

> If the valid law of any jurisdiction is applicable to the
> performance of any obligation or the exercise of any right
> under this Agreement, the obligation shall be exercised in
> accordance with such law to the extent and only to the
> extent that such law shall make mandatory the
> performance of such obligation or the exercise of such
> right other than in accordance with the provisions of this
> Agreement.  All the provisions of this Agreement shall be
> construed in light of paragraph XVIII.I. (Sales and
> Service Agreement, p. 22, Exhibit "L").

10.  In early 2006, the Operating Committee of DTNA engaged in an

examination of all phases of DTNA's truck brands, including supply sourcing, manufacturing, and marketing.  As a part of that process, DTNA's president, Chris Patterson, asked for estimates of what it would cost to exit the Sterling business because he wanted to know at what point spending on the brand would exceed the cost to stop manufacturing Sterling trucks. (Patterson Decl. ¶2)

11.   Sterling had never generated the profits that DTNA hoped it would.  In fact, in most years, Sterling incurred losses.  Nevertheless, the actual shutting down of the manufacturing of Sterling trucks did not happen in 2006 and DTNA ended up undertaking several initiatives, including introducing several new Sterling truck designs.  (*Id.*¶'s 2-3)

12.   Long Lewis was not advised in 2006 that DTNA considered shutting down the Sterling truck line.

13.   Instead, DTNA notified Long-Lewis of Sterling's "Sales Guidelines" for all premium truck orders for 2007, which required Long Lewis to order one 2008 model truck for each 2007 model truck purchased with a high demand EPA 04 engine.  (LL0042).  The only way for Long-Lewis to obtain 2007 model Sterling trucks with EPA 2004 engines was to also buy a like number of 2008 model Sterling trucks.  (Affidavit of Keith Wood, Exhibit "B" to Doc. 79).  Long-Lewis purchased fifty-two 2008 model trucks with a combined invoice cost in excess of $4,411,560.00.  *Id.*

14.   In the spring of 2008, the DTNA Operating Committee engaged in another comprehensive review of DTNA operations and all DTNA brands, including the Sterling product range.  DTNA engaged a consulting firm, McKinsey & Company, to assist in the efforts.  (*Id.*¶4)

15.   In July 2008, the DTNA Operating Committee reported to the Daimler AG Board of Management that the question of continuing Sterling operations had no clear answer and the Board of Management accepted a recommendation that further analysis be conducted before reaching a final decision on whether to continue the program of investment in Sterling already underway or discontinue the manufacture of Sterling vehicles.  (*Id.*)

16.   During the ensuing months, efforts were undertaken to find ways to improve Sterling, including changing the range of products offered.  The Operating

Committee of DTNA and the Executive Committee of Daimler AG's Trucks unit were substantially divided on the better course of action for the company. (*Id.* ¶5)

17.  It was not until September 2, 2008, that the Operating Committee of DTNA decided to recommend to the Daimler AG Board of Management that DTNA exit the manufacturing of Sterling trucks. (*Id.* ¶6)

18.  The evaluation that was conducted in 2008 that ultimately led to a number of actions, including the cessation of Sterling production, was conducted in extreme secrecy. The individual members of the DTNA Operating Committee, members of the McKinsey consulting team, and key members of DTNA management who participated, were required to sign confidentiality undertakings as a precondition to working on the project. This was necessary for Daimler AG to comply with the German Securities Trading Act. (*Id.* ¶8)

19.  Because DTNA's management believed that the Daimler AG Board of Management would accept DTNA's recommendation, DTNA President Chris Patterson instructed the Dealer Operations Department of DTNA in early September 2008 to prepare for the potential announcement of a decision to stop the manufacturing of Sterling trucks. He did so to ensure that the decision by the Daimler AG Board of Management could be communicated to Sterling dealers, customers, and the affected DTNA employees immediately. (*Id.* ¶9)

20.  The Daimler AG Board of Management requested clarification of certain issues before deciding whether to accept or reject DTNA's recommendation. The DTNA Operating Committee provided an additional report to the Daimler AG Board of Management on October 7, 2008. The final decision on exiting the business of manufacturing Sterling trucks was made by the Daimler AG Board of Management on October 14, 2008.

21.  The discontinuation of manufacturing Sterling trucks resulted in the permanent closure of the Ontario, Canada, plant and the loss of over 900 manufacturing jobs, plus other salaried positions. (*Id.* ¶10) As a result of the discontinuance of Sterling and based upon a number of assumptions, DTNA expected annual earning improvements of $900 million by 2011.

22.  Long-Lewis was notified of the discontinuance of the Sterling truck brand

and product line by a letter from Chris Patterson dated October 14, 2008.

23. At the time of the announcement of the discontinuation of manufacturing Sterling trucks, each Sterling dealer was sent a letter offering the dealer a "Transition Bonus Offer," which offered a cash payment, based upon a formula using the dealer's past sales.  (Osborn Decl. ¶4, Exh. C-8; Burrell 128/15-18; AC ¶19-20)

24. Mr. Patterson stated to Long-Lewis in his October 14, 2008 letter:

> If you choose not to participate in the transition Bonus Program and thereby not continue with Daimler trucks as a service dealer, the following will apply:

> You will be offered repurchase assistance as provided under your existing Sterling Sales and Service Agreement, subject to applicable law.

> Following termination of the Sales and Service Agreement, if you do not otherwise sell new OEM product with Detroit Diesel engines, you will not be entitled to a renewal of your Detroit Diesel Direct Dealer Agreement, which is currently set to expire on December 31, 2008.

25. If a dealer accepted the Transition Bonus Offer, the dealer had to sign a release of all claims. (Osborne Decl. ¶4, 6; Exh. C6-8)

26. Long-Lewis chose not to participate in the Transition Bonus Program.

27. DTNA did not repurchase any vehicles from Long-Lewis.

28. Long-Lewis' Sterling operations suffered substantial losses in the period 2003-2008, mostly because of losses in the new truck department.  The chart below, using data from the income statements of Long-Lewis, shows these losses.  (Osborne Decl. ¶9, Exh. E-2, 9, 16, 27, 38, 49)

| Year | Long-Lewis Profit/(Loss) | New Truck Profit/(Loss) |
|------|--------------------------|-------------------------|
| 2003 | ($1,627,735) | ($1,216,442) |
| 2004 | ($358,253) | ($478,162) |
| 2005 | $157,376 | ($552,024) |

| 2006 | ($624,320) | ($1,077,319) |
|---|---|---|
| 2007 | ($1,231,487) | ($1,568,788) |
| 2008 | ($1,342,736) | ($1,685,669) |
| **Total** | **($5,027,155)** | **($6,578,404)** |

29. The Long-Lewis website currently advertises new Sterling trucks and Sterling parts and service sales.[1]  (JPC Decl. Exh. E; Burrell 67/14-23)

30. Long-Lewis continues to use the Sterling trademark on its website, has Sterling signs on the buildings, purchases parts from and submits warranty claims to Sterling, and Sterling parts and service personnel continue to call on the dealership.  (Burrell 68/14-69/5, 71/19-73/4)

31. Sterling parts and service business is critical to Long-Lewis.  With the end of new truck manufacturing effective in March of 2009, Sterling sales became stagnant.  However, service on existing vehicles continues to be vital to Long-Lewis.  (AC ¶21)

32. Long-Lewis' expert, Terry Humphryes, rendered an opinion [on September 30, 2009, doc. 163-3] that Long-Lewis is capable of earning $12,139,734 in net profits over the next nine years from the continuing Sterling parts and service business, if the dealership were permitted by Sterling to continue doing so.[2]  Long-Lewis believes the projections are conservative. (Humphreys 113/5-115/8; Expert Report - Dep. Exh. 66 at pp. 5-6 – JPC Decl. Exh. C; Burrell pp. 71/19-73/4)

33. Mr. Humphreys made his lost profits damages calculation based upon the assumption that Sterling will not let Long-Lewis continue in business after December 31, 2009.[3]  (Humphreys 113/5-114/23)

34. Sterling will manufacture Sterling parts through at least 2018. (Osborne

---

[1] Since the parties filed their joint stipulated facts, Plaintiffs "removed the Sterling name from [their] website."  Doc. 189-13 at 1.

[2] Humphyres September 8, 2010, revised report stated that Plaintiffs are capable of earning $7,197,012 from Sterling parts and service from 2011 - 2018.  Doc. 183-1 at 3.

[3] Humphyres stated in his September 8, 2010, revised report that he calculated "the damages from the termination of the parts and service agreement as if the termination is effective December 31, 2011."  Doc. 183-1 at 5.

Decl. ¶10; Patterson Decl. ¶6; Humphryes 114/24-115/8)

In addition to the jointly submitted facts outlined above, the court adds the following:

35.  The October 14, 2008, letter from Chris Patterson informing Long Lewis of the discontinuation of the Sterling line stated, "As part of the transition process you will receive a formal notice of termination of your Sales and Service Agreement in the coming weeks."  Doc. 185-1 at 1.  No such notification was sent.  Doc. 185-3 at 4; Burrell depo. 122/12-15.36.

36.  Sterling sent Plaintiffs a letter on November 24, 2008, that stated, in relevant part:

As stated in the October 14, 2008 communications, this letter is your formal notice that Sterling Truck Corporation is exercising its rights pursuant to Section IX.B. of your Sterling Trucks Dealer Sales and Service Agreement to discontinue the manufacture of Sterling Trucks vehicles.

This notice does not constitute a notice of termination or modification of your Dealer Agreement, because you may elect to continue operating under your current Dealer Agreement.

Doc. 185-2.

37.  Thereafter, Sterling sent another letter on November 30, 2009, which stated, in relevant part:

In order to avoid the continuing misunderstanding concerning our intent to continue our relationship with Long-Lewis as both a Sterling and Detroit Diesel location, I enclose for your review and signature the following:

•    An addendum to your current Sterling Dealer [SSA] which extends the current agreement until December 31, 2018; and

•    A new Detroit Diesel Direct Dealer Agreement in the current form offered to all DTNA Dealers with an expiration date of

December 31, 2018.

Doc. 185-9 at 1.

38.    As of the date of the oral argument, Plaintiffs had yet to sign the Addendum
       to the SSA or the new Detroit Diesel Dealer Agreement.  *See* doc. 182 at 39.

## III.  ANALYSIS

Five counts remain from the Second Amended Complaint:  Count I, violation of § 8-20-4 of the Alabama Motor Vehicle Franchise Act ("AMVFA"); Count II, violation of § 8-20-5 of the AMVFA; Count III, violation of the Automobile Dealers Day in Court Act ("DDICA"), 15 U.S.C. § 1221, *et seq*.; Count IV, breach of contract; and Count V, suppression.[4]  Defendants have moved for summary judgment on each of these claims.

A.    <u>There was no termination of the SSA (Counts I and II )</u>

In Counts I and II, Plaintiffs contend that Defendants violated the AMVFA by:  (1) coercing them to "purchase certain 2008 model year vehicles in order to be permitted to purchase certain 2007 model year vehicles," (§ 8-20-4(1)(a))[5];

---

[4] The court dismissed Count VI, conspiracy, on March 23, 2010.  Doc. 146.

[5] Section 8-20-4 states, in pertinent part, the following:

Notwithstanding the terms, provisions, or conditions of any [SSA], prior to the <u>termination</u>, cancellation, or nonrenewal of any [SSA], the following acts or conduct shall constitute unfair and deceptive trade practices:

(1) For any manufacturer [ ] to coerce or attempt to coerce any motor vehicle dealer to do any of the following:

(2) engaging in arbitrary and unconscionable conduct by attempting to coerce them

to participate in the Transition Bonus Program ("TBP") and "release Defendants of

claims and damages," (§ 8-20-4(2)); and (3) terminating the SSA in bad faith

without good cause (§§ 8-20-4(3)(d) and 8-20-5(a)(1) and (2)[6]).  Doc. 25 at 16-18.

Because the court believes that the provisions of §§ 8-20-4 and 8-20-5 are triggered

---

     a.  To accept, buy, or order any motor vehicle [ ] which such motor vehicle dealer has not voluntarily ordered or requested except items required by applicable local, state, or federal law.

(2) For any manufacturer [ ] or motor vehicle dealer to engage in any action with respect to a franchise which is arbitrary, unconscionable, unreasonable, or is not in good faith and which causes damage to any of the parties.

(3) For any manufacturer [ ] to do any of the following:

     d.  To cancel or terminate the [SSA] of a motor vehicle dealer other than as hereinafter provided.

(emphasis added).

    [6] Section 8-20-5 states, in pertinent part, the following:

(a) Notwithstanding the terms, provisions, or conditions of any [SSA], no manufacturer shall cancel, _terminate_, modify, fail to renew, or refuse to continue any franchise relationship with a licensed new motor vehicle dealers unless the manufacturer has:

     (1) Satisfied the notice requirement of this section;

     (2) Acted in good faith as defined by this chapter;

     (3) Has good cause for the cancellation, termination, modification, nonrenewal, or noncontinuance.

(emphasis added).

only if there is a termination of the SSA[7], the threshold issue for this court to address is whether, in fact, Defendants terminated the SSA.  Absent a termination, there is no violation under §§ 8-20-4 and 8-20-5 for the conduct Plaintiffs challenge.[8]

  1. *Defendants' position.*

  To no surprise, the parties take diametric views on the termination issue.  Defendants contend they did not terminate Plaintiffs' dealerships and raise several points in support:  (1) that their October 14, 2008, letter stated that the affected dealers would receive a notice of termination, which they never sent to Plaintiffs, doc. 182 at 23, doc. 185 at 7; (2) their November 24, 2008, letter to Plaintiffs specifically stated they were not terminating Plaintiffs as dealers, doc. 166 at 15, doc. 185 at 5; (3) their November 30, 2009, letter extended the offer to continue the current SSA and Detroit Diesel Dealer Agreement through December 31, 2018, doc. 166 at 15, doc. 185 at 17; (4) Plaintiffs "remain [ ] in business and is today offering service to Sterling customers, is selling parts, and is displaying the Sterling

---

  [7] Ala. Code §§ 8-20-4 and 8-20-5 are also triggered if a manufacturer cancels, modifies, or does not renew the SSA.  These are not at issue here, however, since Plaintiffs are only alleging a termination.  Doc. 172 at 4.

  [8] Even if the court is in error that termination is a threshold issue for all of the claims, as shown below, summary judgment is still warranted.

sign on its two dealerships,"[9] doc. 166 at 16, doc 185 at 5; (5) Plaintiffs are "capable of generating [$7.1 million][10] in profits from just the parts and service business through 2018" and "as a matter of law this is not a termination," doc. 166 at 16, *see also* doc. 185 at 13-15; and (6) Sterling invoked its "contractual right to stop manufacturing trucks" because the SSA states that Sterling "reserves the right to discontinue at any time the manufacture or sale of any or all Sterling trucks," doc. 166 at 17. Finally, Defendants contend that *L&B Truck Serv., Inc. v. Daimler Trucks No. Amer., LLC*, 2009 WL 3584346 (D. Vt. Oct. 26, 2009)*, and *Mac's Shell Serv., Inc. v. Shell Oil Prod. Co.*, 559 U.S. 1251 (2010), support their contention that they did not terminate or constructively terminate Plaintiffs' dealerships. Doc. 166 at 17-20; doc. 185 at 12.

2.    *Plaintiffs' position.*

Plaintiffs acknowledge that they are currently servicing and selling parts to Sterling owners, and do not dispute that they can generate $7,197,012 in profits

_____

[9] Although there are two plaintiffs in this case and hence the court's reference to them in the plural, in actuality the "plaintiffs" are one entity operating two dealerships. The court points this out since the quoted language refers to a singular plaintiff.

[10] Defendants quoted Plaintiffs' expert Terry Humphryes' original projection of $12,139,734. However, Humphryes' September 8, 2010, revised report projected $7,197,012.

from the parts and service business through 2018.  They contend, however, that their attempt to stay in business "does not establish that Defendants have not terminated the[ir] franchise."  Doc. 89 at 19.  Instead, Plaintiffs contend Defendants terminated the SSA because:  (1) the October 14, 2008, letter and other internal documents specifically stated that the "franchises would be terminated," doc. 89 at 17, *see also* doc. 189 at 2, and (2) Defendants decided not to renew the Detroit Diesel Dealer Agreement, doc. 89 at 17, doc. 189 at 3-4, 7.  Finally, Plaintiffs attack the SSA by contending that Defendants cannot rely on Section IX.B.[11] to support discontinuing the Sterling line because, in violation of the AMVFA, "they did not exercise good faith [ ] by all the actions and activities they engaged in to try to coerce [Plaintiffs] into taking the [TBP]," doc. 182 at 40, and "because the AMVFA does not provide that a manufacturer's 'determination not to continue to build new trucks' is good cause for termination" or allow a manufacturer to avoid repurchasing obligations, doc. 89 at 20; *see also* doc. 189 at 11.

     3.     *The SSA is still in effect.*

          a.     The plain meaning of the SSA the parties negotiated.

The logical starting point for the court's analysis is the SSA the parties

---

[11] Section IX.B. of the SSA states, "COMPANY reserves the right to discontinue at any time the manufacture or sale of any or all Sterling Trucks Products."  Doc. 189-10 at 1.

negotiated.  Among other things, the SSA gives Plaintiffs the right to sell and service the Sterling truck line and sell Sterling parts.  Both parties agree that the only change in their relationship is Defendants' decision to discontinue the Sterling line, which means that Plaintiffs can no longer sell new Sterling trucks.  In all other respects, the SSA remains in effect.  *See* doc. 182 at 37-39.  The issue then for the court is whether, despite the parties' ongoing relationship, Plaintiffs are correct that Defendants have terminated the SSA (or their franchises) based solely on the decision to cease manufacturing the Sterling line.  For the following reasons, the court disagrees with Plaintiffs.

First, Section IX.B. of the SSA states, "COMPANY reserves the right to discontinue at any time the manufacture or sale of any or all Sterling Trucks Products."  Doc. 189-10 at 1.  In other words, by the terms of the SSA Plaintiffs negotiated, no breach or termination occurs simply from the decision to "discontinue . . . any or all Sterling Trucks Products."  (emphasis added). Therefore, Plaintiffs' contention that Defendants cannot rely on this section since they "did not exercise good faith," or because the "AMVFA does not provide that a manufacturer's determination not to continue to build new trucks is good cause for termination" misses the mark.  Plaintiffs overlook that the opposite is true also -- i.e., the AMVFA does not say that the cessation of a product line is automatically

evidence of bad faith or can never constitute good cause.  *See* Ala. Code § 8-20-5(b).  What the AMVFA says is simply that a manufacturer cannot terminate a franchise unless it provides ninety days notice, acts in good faith, and with good cause.  Ala. Code § 8-20-5(a)(1)-(3) and (e)(2).  In other words, cessation of a line is allowed if done timely, in good faith, and for good cause.  Indeed, to hold that a decision to exit a business for economic reasons can never be deemed as acting in good faith or with good cause would defy logic and contradict the AMVFA, which defines good faith as "[h]onesty in fact and the observation of reasonable commercial standards of fair dealing in the trade," Ala. Code § 8-20-3(8), and Alabama case law, which generally defines good cause as "a reasonable cause, one that is material and substantial as applied to a particular set of facts." *Heatherly v. Carter*, 485 So. 2d 769, 771(Ala. Civ. App. 1986) (citation omitted).  Based on the undisputed facts about the economic pitfalls Defendants faced, *see* doc. 172 at ¶¶ 11, 15, 16, 21, it is clear that the inability to make the Sterling line profitable was a "reasonable cause, one that is material and substantial," i.e., good cause, and the decision to cease manufacturing the Sterling line was based on known market forces and a sinking global economy and that Defendants made the decision utilizing "reasonable commercial standards," i.e., in good faith.

Therefore, in light of the fact that the SSA allows Defendants to cease the

manufacturing of the Sterling line, Plaintiffs need to show more than simply the decision to discontinue production in order to prevail on their termination claim.  In that regard, Plaintiffs assert several additional grounds to support their position. First, Plaintiffs contend that the October 14, 2008, letter and other internal documents state that the "Franchises would be terminated," docs. 89 at 17 and 189 at 2, i.e., that Defendants' own words establish a termination.  A plan to terminate, however, does not mean Defendants actually carried one out.  Indeed, the October 14, 2008, letter stated specifically, "you will receive a formal notice of termination of your [SSA] in the coming weeks."  Doc. 185-1 at 1.  However, the letter also informed Plaintiffs that the "dealer network will continue to perform warranty repairs and maintenance, and continue to supply parts and technical support to Sterling customers," and that Defendants "look[ed] forward to continuing [their] business relationship with [Plaintiffs] in the context of providing outstanding service to our Sterling customers for years to come."  *Id*. at 1-2.  Moreover, Defendants never sent Plaintiffs a termination letter and Plaintiffs do not contend they received one.  In fact, the subsequent correspondence Plaintiffs received stated the exact opposite:  "This notice does not constitute notice of termination or modification of your Dealer Agreement, because you may elect to continue operating under your current Dealer Agreement."  Doc. 185-2.  In other words, the

17

documentary evidence belies Plaintiffs' contention that the October 14, 2008, letter establishes a termination of their franchise.

        b.     The Detroit Diesel Dealership Agreement nonrenewal clause in the October 14, 2008, letter did not apply to Plaintiffs.

Next, Plaintiffs assert that Defendants' decision not to renew their Detroit Diesel Dealer Agreement establishes that Defendants, in fact, terminated the SSA. The relevant language from the October 14, 2008, letter for Plaintiffs' contention states: "If you choose not to participate in the [TBP] and thereby not continue on with Daimler Trucks as a service dealer the following will apply: Following termination of the [SSA], <u>if you do not otherwise sell new OEM[12] product with Detroit Diesel engines</u>, you will not be entitled to a renewal of your Detroit Diesel Dealer Agreement, which is currently set to expire on December 31, 2008." Doc. 185-1 at 2 (emphasis added). Plaintiffs' reliance on this language is unfounded for several reasons.

First, Plaintiffs do not refute Defendants' contention that since Plaintiffs sell Western Star, an <u>OEM product</u>, doc. 172 at ¶ 6; *see also* 182 at 28, they were "entitled to a renewal" of the Detroit Diesel Dealership Agreement, doc. 185 at 16. As the October 14, 2008, letter provided, nonrenewal applied only to those who did

---

[12] OEM stands for Original Equipment Manufacturer, i.e., a product with a Detroit Diesel engine. Doc. 182 at 9.

not "otherwise sell new OEM product with Detroit Diesel engines."  In other words, the conditions in the October 14, 2008, letter never applied to Plaintiffs. Doc. 185 at 16, and their Detroit Diesel Dealer Agreement was never in danger of nonrenewal.

Second, Defendants followed up the October 14, 2008, letter with a November 24, 2008, letter, which made clear to Plaintiffs that they can continue under their current SSA even if they rejected the TBP:  "You have been provided an opportunity to transition from your Dealer Agreement to a new Service Agreement.  In the event you do not accept this opportunity, your current [SSA] remains in effect.  This notice does not constitute a notice of termination or modification of your Dealer Agreement, because you may elect to continue operating under your current Dealer Agreement."  Doc. 185-2.  Therefore, even if the nonrenewal language applied to them -- and it does not since they sold OEM product -- Defendants unconditional offer for Plaintiffs to continue operating under the SSA, without having to accept the TBP as a prerequisite, undermines Plaintiffs' termination contention.

Finally, Plaintiffs have continued purchasing Detroit Diesel parts without incident, doc. 185-3 at 5; depo. at 129-130, and, in fact, Defendants tendered Plaintiffs on November 30, 2009, an offer to renew the Detroit Diesel Dealership

Agreement though 2018.[13]  Doc. 185-9 at 1.  As is evident, the objective facts refute Plaintiffs' contention that Defendants failed to renew their Detroit Diesel Dealer Agreement.  Therefore, Plaintiffs' reliance on the alleged nonrenewal to establish termination of the SSA has no evidentiary foundation.

      c.      The SSA allows Plaintiffs to continue to sell and service Sterling products.

To further support their termination contention, Plaintiffs contend that their attempt to stay in business by selling Sterling parts and servicing Sterling products "does not establish that Defendants have not terminated the franchise."  Doc. 89 at 19.  However, they overlook that the same SSA they contend Defendants terminated is what gives them the right to sell Sterling parts and service Sterling trucks.  Likewise, they overlook that the SSA envisions its own continuity solely on parts and service since it allows Defendants to cease manufacturing "any or all Sterling Trucks products."  Doc. 189-10 at 1.  In the final analysis, Plaintiffs' contention that Defendants terminated the SSA is belied by the fact that Plaintiffs continue to sell and service Sterling products, pursuant to the SSA, and stand to make $7,197,012 from doing so.

      d.      *L&B Truck Serv., Inc. v. Daimler Trucks No. Amer., LLC,* and

---

[13] Plaintiffs have apparently refused to sign the offer.  *See* doc. 182 at 39.  While Plaintiffs may, in fact, have good reason to do so, the nonrenewal of the Detroit Diesel Dealer Agreement is, in part, based on Plaintiffs' decision.

*Carroll Kentworth Truck Sales, Inc. v. Kentworth Truck Co.*
further undermine Plaintiffs' termination contention.

Although not binding, *L&B Truck Serv., Inc. v. Daimler Trucks No. Amer., LLC*, 2009 WL 3584346 (D. Vt. Oct. 26, 2009), is instructive since it arises also from Defendants' decision to discontinue the Sterling line.  Sometime prior to April 2008, L&B notified defendants of a $700,000 expansion plan it intended to begin in September 2008.  *L&B Truck Serv.*, 2009 WL 3584346, at *1.  Thereafter, on April 21, 2008, L&B and Sterling entered into a SSA to "purchase and deal certain Sterling products."  *Id*.  L&B received subsequently the October 14, 2008, letter informing them of the decision to discontinue the Sterling line effective January 15, 2009, a few weeks after L&B began the expansion.  L&B sued and alleged that defendants knew that they planned to discontinue the line prior to October 14, 2008, and asserted, among other things, claims for termination and constructive termination of the franchise agreement, and breach of an implied covenant of good faith and fair dealing, in violation of the Vermont Motor Vehicle Manufacturers, Distributors and Dealers Franchising Practices Act ("MVFPA").  *Id*.  Specifically, L&B alleged that "[d]efendants violated the [MVFPA] by failing to comply with section 4089(a), which prohibits a manufacturer from terminating a franchise" unless it has 1) satisfied the notice requirement, 2) has good cause for the cancellation, termination, or nonrenewal, and 3) has acted in good faith.  *Id*.

21

The MVFPA defines franchise as "all agreements and contracts between the parties relating to the franchise, 'including agreements pursuant to which the dealer . . . performs warranty and other service on the manufacturer's products.'" *L&B Truck Serv.,* 2009 WL 358436, at *2; 2009 Vt. Acts & Resolves Act. No. 57, § 4085(6).  Regarding whether a termination occurred, the court held:

> [Defendants] did not terminate, cancel, or fail to renew the SSA as it pertains to [plaintiffs'] provision of parts and service to owners and purchasers of Sterling products.  Though [defendants] discontinued manufacturing Sterling trucks, as it had reserved the right to do in the SSA, [plaintiffs] can continue to sell parts and provide service for Sterling trucks and the SSA remains in effect with regard to everything but selling new Sterling trucks.  Because the termination provision of the MVFPA applies when a franchise has been terminated, cancelled, or not renewed and [plaintiffs'] entire franchise agreement has not been terminated, cancelled, or not renewed, Plaintiffs have not stated a claim for which relief can be granted under section 4089 of the MVFPA.

*L&B Truck Serv.*, 2009 WL 3584346, at *3 (citations omitted).

As in *L&B Truck Serv.*, there is no termination here because the entire SSA was not voided by the discontinuation of the Sterling truck line.  Indeed, as stated previously, the only difference is that Plaintiffs can no longer sell new Sterling trucks since, significantly, there are none; in all other respects, the current SSA remains in effect, which presumably Plaintiffs are currently operating under to buy and/or sell Sterling parts and service.  Doc. 166 at 10, ¶¶ 27, 28, and 29.  In fact, as Plaintiffs testified, they continue to purchase parts from and submit warranty

22

claims to Sterling, and Sterling parts and service personnel continue to call on the dealership, both of which are covered by the SSA. Doc. 163-1 at 18, depo. pp. 68-69. Moreover, Defendants have tendered an offer for the current SSA and the Detroit Diesel Dealer Agreement to remain in effect until December 2018, further refuting Plaintiffs' contention that Defendants terminated the SSA. Doc. 166-2 at 1, 41, doc. 185-9 at 1. Significantly, Plaintiffs' revenue projections for service and sales of parts also undermine their termination contention. By their conservative account, Plaintiffs will make $7,197,012 in net profits over the next nine years from the continuing parts and service business, as compared to the net loss of $6,578,404, in the years when they sold new Sterling trucks. Under these undisputed facts, it is difficult to see the termination Plaintiffs contend occurred.

Finally, Plaintiffs' argument that *Carroll Kentworth Truck Sales, Inc. v. Kentworth Truck Co.,* 781 F.2d 1520 (11th Cir. 1986), supports their contention that there is a question of fact on the termination issue is unpersuasive. *Carroll* is distinguishable because the issue there was whether defendant acted in bad faith when it failed to give plaintiff ninety days notice, as required by the AMVFA, of its decision to renew the franchise agreement for one year, instead of the typical three years. The district court instructed the jury that defendant's failure to provide the required ninety days notice "could be considered as bearing on the issue of good

faith." *Carroll*, 781 F.2d at 1528 n7.  Holding that "the existence of evidence sufficient to create a jury question is to be determined by the court on a case by case basis," *Carroll*, 781 F.2d at 1526, the court determined that "a jury reasonably could conclude that [defendant] failed to act in good faith" under the AMVFA's liberal definition of bad faith.[14]  *Carroll*, 781 F.2d at 1529.

Here, Defendants gave Plaintiffs ninety days notice before the cessation of the Sterling line on January 15, 2009, as required by the AMVFA.  Moreover, unlike *Carroll*, there is no allegation that the economic reasons Defendants cited are an "arbitrary quota," i.e., the basis the plaintiff in *Carroll* used to contend that Defendants terminated it when they renewed the agreement for one year instead of the standard three years.  Finally, also unlike *Carroll* where Defendant apparently could not arbitrarily change the terms of the contract, here, Defendants had the right under the SSA to cease the manufacturing of the Sterling line.  Therefore, there is no issue of fact here for the jury to decide on the termination issue.

In essence, Plaintiffs want this court to find that Defendants terminated the

---

[14] Although the plaintiff presented several arguments to support its contentions, the *Carroll* court considered only its argument that defendant terminated the parties' dealership agreement in bad faith when it renewed Plaintiffs' franchise agreement for one year based on an "arbitrary quota" that the plaintiff could not meet, as opposed to three years as it had historically done.  *Carroll*, 781 F.2d at 1526.

SSA based on an announced intent to do so and Plaintiffs' perception of the

October 14, 2008, communication.  However, this court must rely on the plain

meaning of the evidence presented rather than a party's interpretation.  *See Norfolk*

*S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1290 (11th Cir. 2004); *Price v.*

*Time, Inc.*, 416 F.3d 1327, 1335-36 (11th Cir. 2005).  Here, when read as a whole,

the language of the October 14, 2008, letter does not establish a termination of the

SSA.  To the contrary, it references a formal notice of termination which Plaintiffs

never received.  Moreover, the court cannot ignore subsequent events, in particular,

the November 24, 2008, letter giving Plaintiffs the option to accept the TBP or

continue with the current SSA and which specifically states that "[t]his notice does

not constitute a notice of termination or modification of your Dealer Agreement,

because you may elect to continue operating under your current Dealer

Agreement."  Doc. 185-2.  In light of these undisputed facts, there was no

termination of the SSA.[15]  Consequently, summary judgment is GRANTED as to

---

[15] Even if Plaintiffs contend that Defendants modified the SSA, instead of terminating it when it ceased manufacturing the Sterling line, their claims would still fail because Defendants acted in good faith and had good cause.  *See* §§ 8-20-4 and 8-20-5.  Likewise, even if there was a termination, Defendants complied with §§ 8-20-4 and 8-20-5 because they gave notice, acted in good faith, and had good cause to discontinue the Sterling line, i.e., never made a profit and, in fact, lost money, and are projected to net $900 million by this year because of their decision. This lack of bad faith is fatal also to Plaintiffs' separate claim that Defendants acted in "bad faith and in an arbitrary and unconscionable manner. . . ."  Doc. 25 at ¶32(c).

Counts I and II.[16]

 4.   *Defendants' "one to one" program did not violate the AMVFA.*

 Plaintiffs contend that Defendants violated the AMVFA by "requiring . . . [them] to purchase certain 2008 model year vehicles in order to be permitted to purchase certain 2007 model year vehicles." Doc. 25 at ¶32(a). Defendants argue that its "one for one" program did not violate the statute because there was no coercion, and that it can "condition the ordering of its trucks in order to further sales." Doc. 166 at 31. Defendants argue further that Plaintiffs could have purchased any amount of the 2007 trucks with an EPA 2007 engine. Doc. 166 at 31.

 Plaintiffs responded that they did not voluntarily purchase the 2008 trucks, doc. 89 at 6, and that *Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.,*

---

[16] Although Plaintiffs did not plead a constructive termination, one did not occur because Plaintiffs have not alleged that they cannot survive without selling Sterling trucks. *See L&B Truck Serv.*, 2009 WL 3584346, at *3 ("Plaintiffs . . . have made no allegation that [its] dealership cannot survive or that the discontinuation of the Sterling line will have an adverse effect. [Plaintiffs] may continue providing Sterling parts and service under the SSA. Further, [plaintiffs'] franchises with other Daimler brands Freightliner and Western Star continue in effect."). In fact, their expert, Terry Humphryes, opined that they are capable of earning $7,197,012 in net profits over the next nine years from the continuing Sterling parts and service business. Doc. 166 at 10, ¶30. Further, Plaintiffs operate also a Western Star Franchise at its Bessemer location, doc. 172 at ¶6, and Defendants tendered an offer to continue the Detroit Diesel Dealership Agreement through 2018, doc. 185-9 at 1. Therefore, the evidence is insufficient to establish a constructive termination claim.

*Inc.*, 781 F.2d 1520, 1522 (11th Cir. 1986), is instructive on violations of the

DDICA and indicates a higher probability of a violation of the AMVFA, doc. 81 at

8.[17]  Moreover, Plaintiffs contend that the *Carroll* court's finding that the AMVFA

has a more liberal definition of good faith than the DDICA establishes that a jury

could find that the "one to one" program violated the AMVFA.

That *Carroll* holds that the AMVFA has a liberal good faith definition is not

helpful in the analysis here since *Carroll* was a termination case.  Here, the

AMVFA provides the necessary guidance since it specifically defined coercion and

made clear that certain conduct, i.e., persuasion or urging, for example, "shall not

be deemed to constitute a lack of good faith."[18]  This exception is fatal to Plaintiffs'

contention because it means a party is free to use persuasion, urging, or other

---

[17] Plaintiffs also rely on *Randy's Strudebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 515 (10th Cir. 1976), *McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir. 1974), and *Amer. Motor Sales Corp. v. L.G. Semke*, 384 F.2d 192 (10th Cir. 1967), to support the contention that Defendants coerced them to purchase the 2008 trucks and acted in bad faith.  Doc. 81 at 5-7.  However, these cases are distinguishable because Plaintiffs here did not allege in their Complaint a DDICA violation regarding the "one to one" program.  Moreover, the facts here are distinguishable from *American Motors* in at least one significant respect, i.e., there is no allegation by Plaintiffs that they feared not being able to get *any* trucks if they did not participate in the "one for one" program.

[18] The AMVFA defines coercion as the "failure to act in good faith in performing or complying with any term or provision of the [SSA], except that recommendation, persuasion, urging, or argument shall not be deemed to constitute a lack of good faith."  Ala. Code § 8-20-3(1).  Good faith is defined as "honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade as defined and interpreted in paragraph (1)(b) of Section 7-2-103." Section 7-2-103(a)(b) defines "good faith" using the same language as 8-20-3(8).

tactics, short of a threat of force, i.e., coercion.  In other words, as long as an entity uses tactics that a party is free to reject, even the AMVFA's liberal definition of "good faith" does not prohibit persuasive conduct.

In that regard, the court notes that Plaintiffs make no allegation here that they feared not being able to get any trucks if they declined to participate in the "one for one" program.  To the contrary, the evidence is undisputed that Plaintiffs were free to order as many 2007 EPA engine trucks as they wanted.  Instead, because of the high demand for 2004 EPA engine trucks, Plaintiffs rightly so wanted these trucks and the corresponding profit they generated.  Unfortunately, so did other dealers.  Moreover, the Environmental Protection Agency's ("EPA") mandate that manufacturers cease production of these engines created a short supply.  Faced with a shrinking supply and a growing demand, Defendants conditioned the purchase of the EPA 2004 engines to an equal number of EPA 2007 engines.  The requirement, however, was not coercion since Defendants never required Plaintiffs to participate in the program.  While Plaintiffs contend they had no choice, in the end, they voluntarily ordered the EPA 2004 engine trucks because they wanted them, and were willing to participate in the "one for one" program to get them.  Significantly, Plaintiffs believed they could generate a profit from the same EPA 2007 engine trucks they claimed Defendants coerced them into

28

purchasing and that they would not have purchased them if they did not expect to profit from their sale.  Doc. 82-5 at 39, depo. at 147-48.  Likewise, while they contend they purchased the trucks involuntarily, they admit that they "got rid of [their] final inventory of trucks," doc. 182 at 41, which belies their contention that they incurred damages as a result of Defendants' alleged coercion.  Doc. 82-4 at 18, depo. at 63.

Finally, the court notes that Defendants implemented the "one for one" program in good faith -- i.e., they showed "honesty in fact" by making it known up-front that because of supply pressures, Plaintiffs and all other Sterling dealers could order EPA 2004 engine trucks only if they ordered also an equivalent number of EPA 2007 engine trucks.  Further, Defendants observed reasonable commercial standards because they implemented the program due to the short supply and high demand for the EPA 2004 engines.  Since Plaintiffs remained free at all times to choose not to participate in the program and, instead, order other models, their coercion claim fails.

B.   <u>Defendants did not attempt to coerce Plaintiffs into participating in the Transition Bonus Program and releasing claims and damages in violation of the DDICA (Count III)</u>.

In Count III, Plaintiffs allege that because they "did not participate in

Defendants Transition Bonus Program," and did not sign "a *prospective* release of claims and rights," Defendants "non renewed [their] Detroit Dealer Direct Service Agreements for both Long Lewis dealerships," in violation of the DDICA.[19]  Doc. 89 at 27; *see* doc. 166-2 at 71 (emphasis in original).  Defendants disagree and contend that "nothing happened" to Plaintiffs and that Defendants "tendered dealer agreements for both Sterling and Detroit Diesel through 2018."  Doc. 166 at 28. The record supports Defendants' position.

The DDICA requires "a dealer to show that a manufacturer failed to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise.  Good faith is statutorily defined as:  the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from another party."  *Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.*, 781 F.2d 1520, 1524 (11th Cir. 1986); 15 U.S.C. § 1221(e).  Bad faith under the DDICA "has been

---

[19] This claim seems similar to the one asserted in Count I in which Plaintiffs allege that Defendants violated the AMVFA by engaging in unconscionable and arbitrary conduct by attempting to coerce them to participate in the TBP "which would, through a *prospective* waiver of claims, release the Defendants from termination payment obligations required by their franchise agreement and state franchise acts."  Doc. 89 at 24 (emphasis in original); *see also* Doc. 25 at ¶32.e.  Summary judgment is due also on the alleged AMVFA violation for the same reasons as stated here.

defined narrowly and construed strictly" and "does not mean simply a lack of fairness but entails a showing of coercion."  *Id*. (citations omitted).

In light of the court's finding that no termination of the SSA occurred, Defendants violated the DDICA only if they failed to act in good faith in performing or complying with the terms of the franchise or SSA.[20]  It is undisputed that (1) the SSA allowed Defendants to discontinue manufacturing Sterling trucks, doc. 189-10 at 1; *see also* doc. 182 at 37; (2) the SSA has remained in effect unconditionally, except for the sale of new Sterling trucks, and Plaintiffs continue to purchase parts from and submit warranty claims and that Defendants' parts and service personnel continue to call on the dealership, doc. 189-12 at 18-19, depo. at 68-69; and (3) Sterling service on existing vehicles continues to be vital to Plaintiffs' businesses, doc. 25 at ¶21.  In other words, Plaintiffs have made no showing of bad faith in Defendants' performance and compliance with the terms of the SSA.

Further, there is no evidence that Defendants coerced Plaintiffs to accept the TBP by nonrenewing the Detroit Diesel Dealership Agreement.  The October 14,

---

[20] The DDICA defines franchise as the "written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract."  15 U.S.C. § 1221(b).

2008, letter Defendants sent to Plaintiffs stated that if they did not accept the TBP by January 15, 2009, "following termination of the Sales and Service Agreement, <u>if you do not otherwise sell new OEM product with Detroit Diesel engines</u>, you will not be entitled to a renewal of your Detroit Diesel Direct Dealer Agreement, which is currently set to expire on December 31, 2008." Doc. 166-2 at 72 (emphasis added). Plaintiffs would indeed have a jury issue if there were no other facts. However, as the court mentioned previously, this provision did not apply to them since they sold OEM product, Western Star. Doc. 172 at ¶ 6. Morever, on November 24, 2008, approximately two months <u>before</u> the TBP acceptance deadline, Defendants informed Plaintiffs that "[i]n the event you do not accept [the TBP], your current [SSA] remains in effect," and that "[t]his notice does not constitute a notice of termination or modification of your Dealer Agreement." Doc. 185-2 at 1. Further, a November 30, 2009, letter extended an offer for the Detroit Diesel Dealership Agreement to remain in effect until December 31, 2018. Doc. 185 at 1. In other words, nothing happened to Plaintiffs' Detroit Diesel Dealer Agreement because of their decision to reject the TBP. Therefore, Defendants conduct in offering the TBP cannot be perceived as a bad faith threat of coercion in violation of the DDICA.

Plaintiffs contend also in their brief that Defendants "one to one" program

violates the DDICA.  Doc. 136 at 8-9.  As stated previously, Plaintiffs did not plead this claim in their Amended Complaint.  *See* doc. 25.  Therefore, there is no claim for the court to address.  Moreover, it fails in any event because Defendants never required Plaintiffs to buy the EPA 2004 engine trucks or to participate in the program.  Therefore, Defendants "one to one" program was not coercion and did not violate the DDICA.

C.     Affirmative and/or constructive breach of contract (Count IV).

Plaintiffs raise several allegations which they contend also violate the AMVFA.  First, they contend that any violation of the AMVFA becomes a breach of the SSA because Section XVIII(I)[21] incorporates state law.  Doc. 89 at 28.  This argument is unpersuasive because, as discussed earlier, there is no violation of the AMVFA since Defendants have not terminated the SSA or, alternatively, did so or modified it with good cause and in good faith.

─────────────

[21] SSA Section XVIII.I. states:

I.     Compliance with Local Law

If the valid law of any jurisdiction is applicable to the performance of any obligation or the exercise of any right under this Agreement, the obligation shall be exercised in accordance with such law to the extent, and only to the extent, that such law shall make mandatory the performance of such obligation or the exercise of such right other than in accordance with the provisions of the Agreement.  All the provisions of this Agreement shall be construed in light of this Paragraph XVIII.I.

Next, Plaintiffs argue that Defendants breached the SSA when they "failed and refused to comply with the repurchase obligations of their own franchise agreement, which they represented they would do in their correspondence of October 14, 2008," and "failed to comply with the repurchase obligations set forth in the AMVFA." Doc. 89 at 29. This argument fails for several reasons. First, the repurchase requirements are not available to Plaintiffs under the AMVFA § 8-20-5(j)[22], which requires compensation only in the event of a termination, cancellation, or nonrenewal by the manufacturer -- none of which have occurred here. Second, Defendants' October 14, 2008, letter stated, "If you choose not to participate in the TBP and thereby not continue on with Daimler Trucks as a service dealer, the following will apply: You will be offered repurchase assistance <u>as provided under your existing Sterling Dealer [SSA]</u>, subject to applicable state law."[23] Doc. 166-2 at 71 (emphasis added). However, Defendants argued at the October 18, 2010, hearing that the SSA does not provide repurchase assistance, doc. 182 at 30, a fact

---

[22] Section 8-20-5(j)(1) states, in pertinent part, "[u]pon the termination, cancellation, or nonrenewal by the manufacturer occurring as a result of the cessation of a line make . . ., the new motor vehicle dealer shall be paid fair and reasonable compensation by the manufacturer for the items described in subdivisions (g)(1) though (g)(6)," where (g)(1) includes "[n]ew motor vehicle inventory of the current and previous model year which has been acquired from the manufacturer."

[23] Further, in the October 18, 2010, hearing, Defendants stated, and Plaintiffs did not refute, that the SSA does not "contain in any circumstance that would remotely contemplate these facts an obligation to repurchase trucks." Doc. 182 at 30.

Plaintiffs did not refute.[24]   Therefore, there is no evidence before the court that Defendants breached the SSA when it declined to repurchase Plaintiffs' inventory. Moreover, even if the October 14, 2008, letter is construed as a modification of the SSA, the letter contemplated a termination of the SSA, specifically a decision not to continue as a "service dealer" -- which, of course, Plaintiffs continue to be. Finally, the November 24, 2008, letter stated unequivocally that if Plaintiffs did not accept the TBP, their "current [SSA] remains in effect," and that "[t]his notice does not constitute a notice of termination or modification of your [SSA]."  Doc. 166-2 at 80.  Because Defendants' November 24, 2008, letter offered a continuation of the current SSA in lieu of accepting the TBP, repurchase assistance was no longer an issue.  Based on these facts, Defendants did not breach the SSA and, accordingly summary judgment is GRANTED on Count IV.

D.   Defendants did not suppress their intention to discontinue the Sterling truck line (Count V).

Plaintiffs allege in Count V that Defendants suppressed their "intention to

_____

[24] Although the court does not appear to have the entire SSA, a review of a relevant portion states that Defendants are obligated to repurchase "eligible property" in the event of a termination due to death or incapacity of the owners or managers, or in the event the SSA "expires at the completion of its term," neither of which have occurred here.  Doc. 189-10 at 11, 17.

discontinue the Sterling brand truck line in a timely manner." Doc. 25 at 21. Defendants argue that *Morris v. Merritt Oil*, 686 So. 2d 1139, 1145 (1996), provides that a suppression claim requires a "failure to disclose a fact, not a possibility," and that "[u]ntil the decision to stop making Sterling trucks was made, it was not a fact." Doc. 166 at 28. It is undisputed that Defendants made their final decision to discontinue the Sterling truck line on October 14, 2008, doc. 172 at ¶20, the same date Plaintiffs received notice, *id*. at ¶ 22. Therefore, a suppression claim based on the October 14, 2008, decision fails.

As to the evaluation of the lines' profitability Defendants undertook prior to October 14, 2008, "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala. Code § 6-5-102. A fraudulent suppression claim requires the plaintiff to prove that, 1) defendant had a duty to disclose a fact of which it had knowledge; 2) defendant suppressed the fact by concealment or non-disclosure; 3) the suppression induced the plaintiff to act or refrain from acting; and 4) the acting or refraining from acting caused damage to plaintiff. *Ex parte Life Ins. Co. of Ga.*, 810 So. 2d 744, 748 (1991) (citations omitted). "In evaluating the question whether [the defendant] had a duty to speak, [the trial court] must

consider a number of factors:  (1) the relationship of the parties; (2) the relative

knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's

opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant

circumstances." *State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834, 842-43

(1998); *Armstrong Bus. Serv., Inc. v. AmSouth Bank*, 817 So.2d 665, 676-77 (Ala.

2001).  However, "[i]n commercial transactions involving parties to arm's length

negotiations, however, a bright line rule generally applies:  The parties have no

general obligation to disclose, but each has an affirmative duty to respond

'truthfully and accurately' to direct questions from the other." *Shutter Shop, Inc. v.

Amersham Corp*., 114 F. Supp. 2d 1218, 1225 (M.D. Ala. 2000).  "Thus, Alabama

law presumes that the parties are capable of handling their own affairs and

guarding their interests by asking reasonably specific, direct questions that will

satisfy their need for information. The parties decide what information they need,

and the law protects their rights to receive it." *Id*.

Applying Alabama law to these facts, Defendants had no duty to disclose

their evaluation of the Sterling truck line's viability.  Plaintiffs could have guarded

their interest and investments by inquiring into Sterling's solvency and longevity

and Plaintiffs failed to allege that they made any such inquiry or that Defendants

failed to answer.  Moreover, the 2008 economic events that where part of the

decision to terminate the line did not occur in a vacuum.  To the contrary, the automobile industry factored prominently in the overall economic meltdown and resulted in plant closings and the elimination of some product lines by various manufacturers.  Based on these industry-wide events and the overall economic climate, a prudent dealer would have likely discussed internally and inquired into the viability of the products they carried.  Therefore, Plaintiffs' suppression claim fails.

## IV.  CONCLUSION

In light of the court's decision to **GRANT** Defendants' Motion for Summary Judgment, the court need not reach Defendants' contention that the AMVFA violates the dormant Commerce Clause.  This matter is **DISMISSED** with prejudice.

Done the 31st day of March, 2011.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE